The PEOPLE of the State of Colorado, Petitioner,

v.

Emilio J. LUCERO, Respondent.

No. 85SC318.

Supreme Court of Colorado, En Banc.

Dec. 21, 1987.

Rehearing Denied Jan. 11, 1988.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Virginia Byrnes Horton, Asst. Atty. Gen., Denver, for petitioner.

David F. Vela, State Public Defender, Janet Y. Fullmer, Linda Perkins, Deputy State Public Defenders, Denver, for respondent.

LOHR, Justice.

The defendant, Emilio J. Lucero, was convicted of attempted robbery of the elderly and conspiracy to commit robbery of the elderly. He appealed, contending that the trial court had erred in receiving the testimony of Rosemary Trujillo, who claimed to be the defendant's common law wife. The defendant based his objection to the admission of such evidence upon section 13–90–107(1)(a), 6 C.R.S. (1973), which creates a privilege with respect to testimony by one spouse for or against the other. The Colorado Court of Appeals held that, contrary to the trial court's ruling, the evidence established a common law marriage and that admission of Trujillo's testimony violated section 13–90–107(1)(a) and was reversible error. We conclude that the trial court's ruling lacks sufficient detail to enable us to determine whether that court applied the correct standards in determining the existence of a common law marriage, and that the court of appeals erred in determining this issue as a matter of law on appeal. We reverse the judgment of the court of appeals and return the case to that court with directions to remand it to the

district court for further proceedings as detailed in this opinion.

## I.

On October 20, 1982, Emilio J. Lucero was charged by information filed in El Paso County with three counts of attempted first-degree murder, one count of attempted robbery of the elderly, one count of conspiracy to commit robbery of the elderly, and one count of crime of violence.[1] The charges were based on an incident in which a man had approached an elderly couple in a K mart parking lot and attempted to grab the wife's purse. He struggled with the husband momentarily and then ran. During the course of this episode and again later, while being pursued by a citizen who had witnessed the attempted robbery, the man fired several shots from the pistol he was carrying. A jury trial commenced on February 7, 1983, and resulted in guilty verdicts to the charges of attempted robbery of the elderly and conspiracy to commit robbery of the elderly. During the second day of the trial, the prosecution called Rosemary Trujillo to the witness stand. The prosecutor asked how she knew the defendant, and she replied, "Common law." When asked what she meant by "common law," she answered, "We were living together." She then testified that she and the defendant had lived together for about five years, from 1976 to 1981, and that one child, Emilio Trujillo, had been born to them.

At this point, defense counsel approached the bench and objected to the admission of Trujillo's testimony based on the marital privilege set forth in section 13–90–107(1)(a). He requested an opportunity to make an offer of proof outside the presence of the jury, and the judge agreed to allow him to do so during the next recess. The prosecution was then permitted to continue its direct examination. Trujillo testified that she owned a white 1973 Mercury, which was the same make and model as a car involved in the crime, and that she gave Lucero permission to use her car on October 6, 1982, the date on which the charged offenses occurred. She also stated that she did not have any guns and that to her knowledge there were no bullets in the car on that date.[2]

When the court took a brief recess, the defense was allowed to make its offer of proof with respect to the alleged common law marriage between Trujillo and Lucero. The offer of proof consisted solely of the testimony of Rosemary Trujillo. She testified that she considered herself married to Lucero, and that the two of them held themselves out to friends as being married. She answered, "yes," to the question, "[a]nd do you know if [Lucero] agreed with your analysis that the two of you were married?" Trujillo also repeated her earlier testimony about the duration of her relationship with Lucero and about the birth of their child, who was five years old at the time of the trial.

The trial court denied the objection to the admission of Trujillo's testimony, finding that there was insufficient proof of a marital relationship and that the witness's testimony did not pertain to any conversation between Trujillo and Lucero. Therefore, the trial court reasoned, the testimony was not protected by the marital privilege. The defendant was subsequently convicted of attempted robbery of the elderly, §§ 18–2–101, 18–4–301 and –304, 8 C.R.S. (1973), and of conspiracy to commit robbery of the elderly, §§ 18–2–201, 18–4–301 and –304, 8 C.R.S. (1973).

---

1. *See* §§ 18–2–101, 18–3–102, 8 C.R.S. (1973) (attempted first-degree murder); §§ 18–2–101, 18–4–301, –304, 8 C.R.S. (1973) (attempted robbery of the elderly); §§ 18–2–201, 18–4–301, –304, 8 C.R.S. (1973) (conspiracy to commit robbery of the elderly); § 16–11–309, 8 C.R.S. (1973) (crime of violence). The information was amended shortly thereafter, adding three counts of habitual criminal, § 16–13–101, 8 C.R.S. (1973). Based on further proceedings,

and for reasons not relevant for purposes of this opinion, only the charges of attempted robbery of the elderly and conspiracy to commit robbery of the elderly were submitted to the jury.

2. A shell casing was found in the K mart parking lot after the incident, and bullets of the same caliber were discovered in a search of the white Mercury.

The court of appeals reversed the convictions and remanded the case for a new trial, holding that the uncontradicted evidence established, as a matter of law, the existence of a common law marriage between Lucero and Trujillo, and that section 13–90–107(1)(a) provides an absolute privilege against testimony by one spouse for or against the other absent the consent of the non-testifying spouse. *People v. Lucero*, 707 P.2d 1040, 1042 (Colo.App.1985). We granted certiorari to determine whether a common law marriage was established by the evidence presented in this case and whether the testimonial privilege incorporated in section 13–90–107(1)(a) is an absolute bar to adverse testimony by a defendant's spouse in a criminal case without the consent of the defendant.

## II.

■ A common law marriage is established by the mutual consent or agreement of the parties to be husband and wife, followed by a mutual and open assumption of a marital relationship. *See* H. Clark, *Law of Domestic Relations* 47–50 (1968); Mills, *Common Law Marriage in Colorado*, 16 Colo. Law. 252 (1987). This court suggested both these requirements when it first recognized common law marriage in *Klipfel's Estate v. Klipfel*, 41 Colo. 40, 46, 92 P. 26, 27–28 (1907):

[I]n this state a marriage simply by agreement of the parties, followed by cohabitation as husband and wife, and

such other attendant circumstances as are necessary to constitute what is termed a common-law marriage, may be valid and binding.

(quoting *Taylor v. Taylor*, 10 Colo.App. 303, 304–05, 50 P. 1049, 1049 (1897)). In *Taylor v. Taylor*, the first Colorado Court of Appeals [3] also recognized that "[t]he great weight of authority is that the contract alone is not sufficient, unless it is followed by its consummation, that is, by cohabitation as husband and wife." 10 Colo.App. at 305, 50 P. at 1049.

■ Although language in some of our cases could be read as suggesting that mutual consent or agreement is the only essential element of a common law marriage,[4] we have almost uniformly required that such consent or agreement be manifested by conduct that gives evidence of the mutual understanding of the parties. *See, e.g., Clark v. Clark*, 123 Colo. 285, 229 P.2d 142 (1951); *Moffat Coal Co. v. Industrial Comm'n*, 108 Colo. 388, 118 P.2d 769 (1941); *Clayton Coal Co. v. Industrial Comm'n*, 93 Colo. 145, 25 P.2d 170 (1933); *Davis v. People*, 83 Colo. 295, 264 P. 658 (1928); *Foley v. Gavin*, 76 Colo. 286, 230 P. 618 (1924); *In re Matteote's Estate*, 59 Colo. 566, 151 P. 448 (1915). We affirm today that such conduct in a form of mutual public acknowledgment of the marital relationship is not only important evidence of the existence of mutual agreement but is essential to the establishment of a com-

---

3. The legislature created the first court of appeals in 1891 to help relieve the heavy workload of the supreme court. It was discontinued in 1905 when the supreme court was expanded to seven judges. The second court of appeals served from 1911 to 1914 and was created by the legislature to help the supreme court get caught up on its docket. *See* J. Jameson, A Preliminary Inventory of Certain Supreme Court Records of the State of Colorado (Aug. 1965). The current court of appeals was created by the legislature in 1969. *See* Ch. 106, sec. 1, § 37–21–1, 1969 Colo. Sess. Laws 265.

4. In *Peters v. Peters*, 73 Colo. 271, 215 P. 128 (1923), the court suggested that if there was evidence to support the marriage agreement or contract, evidence of habit and repute was not necessary. The decision stated, "[t]he habit and repute of marriage are not an essential of the legality of the relationship but merely evidence

of an essential, i.e., consent." 73 Colo. at 274, 215 P. at 129. However, even in that case, we made reference to the requirements of *Taylor v. Taylor*, 10 Colo.App. at 305, 50 P. at 1049, that there be both a contract and consummation of that contract by cohabitation as husband and wife when we stated, "[a]dmitting the existence of the contract and its consummation, and the absence of habit and repute, the law will uphold the marriage relation." 73 Colo. at 274, 215 P. at 129. *See also Moffat Coal Co. v. Industrial Comm'n*, 108 Colo. 388, 118 P.2d 769 (1941) (relying on *Peters v. Peters* for the statement that habit and repute of marriage are not essential to the legality of the relationship); *Thimgan v. Mathews*, 74 Colo. 93, 219 P. 211 (1923) (citing *Peters v. Peters* for the proposition that proof of habit and repute is not needed if the contract is otherwise proved).

mon law marriage. The reason for this requirement is to guard against fraudulent claims of common law marriage. As Professor Clark suggests in his treatise on domestic relations, "[a]dding the requirement of open marital cohabitation gives assurance that some objective evidence of the relationship will have to be introduced in every case to establish that the parties did consider themselves husband and wife." H. Clark, *Law of Domestic Relations* 48 (1968).

The very nature of a common law marital relationship makes it likely that in many cases express agreements will not exist. The parties' understanding may be only tacitly expressed, and the difficulty of proof is readily apparent. We have recognized that "the agreement need not have been in words," *Smith v. People*, 64 Colo. 290, 293, 170 P. 959, 960 (1918); *see also Rocky Mountain Fuel Co. v. Reed*, 110 Colo. 88, 130 P.2d 1049 (1942), and the issue then becomes what sort of evidence is sufficient to prove the agreement. We have stated that if the agreement is denied or cannot be shown, its existence may be inferred from evidence of cohabitation and general repute.[5] *See, e.g., Graham v. Graham*, 130 Colo. 225, 227, 274 P.2d 605, 606 (1954); *James v. James*, 97 Colo. 413, 414, 50 P.2d 63, 64 (1935); *Smith v. People*, 64 Colo. at 293, 170 P. at 960; *Klipfel's Estate v. Klipfel*, 41 Colo. at 46–47, 92 P. at 28. In such cases, the conduct of the parties provides the truly reliable evidence of the nature of their understanding or agreement.[6]

Thus, as the standards governing common law marriage have been applied, the line between the two elements has become obscured. Courts have increasingly relied on the conduct of the parties to infer that an agreement also existed. As Professor Clark suggests, "the rules of evidence have largely supplanted the rules of substantive law as a means of determining the existence of common law marriage.... In short, the existence of common law marriage has come to depend to a very great extent upon the duration and character of the relationship between the parties." H. Clark, *Law of Domestic Relations* 49–50 (1968). Professor Clark also points out that this makes sense in light of the policy reasons underlying the continued recognition of common law marriage, which today serves mainly as a means of protecting the interests of parties who have acted in good faith as husband and wife.

Our formulations of the requirement of conduct manifesting or confirming the parties' understanding or agreement have taken many forms. *See, e.g., Graham v. Graham*, 130 Colo. at 227, 274 P.2d at 606 (to establish the agreement there must be evidence both of cohabitation and reputation); *In re Estate of Danikas*, 76 Colo. 191, 194, 230 P. 608, 610 (1924) (illicit cohabitation will not support reputation as proof of marriage; reputation alone is not enough); *Smith v. People*, 64 Colo. at 294, 170 P. at 960 (consent may be inferred from cohabitation and repute; cohabitation is "holding forth to the world by the man-

---

5. The cases in this jurisdiction have used language suggesting that an agreement "may be proven by, and *presumed* from, evidence of cohabitation as husband and wife, and general repute," *Taylor v. Taylor*, 10 Colo.App. at 305, 50 P. at 1049 (emphasis added), interchangeably with language stating that "mutual consent may be *inferred* from cohabitation and repute," *Smith v. People*, 64 Colo. at 293, 170 P. at 960 (emphasis added). In applying these standards to particular facts, we have generally not treated evidence of cohabitation and repute as creating a presumption of a common law marriage. *See Graham v. Graham*, 130 Colo. 225, 274 P.2d 605 (1954); *Moffat Coal Co. v. Industrial Comm'n*, 108 Colo. 388, 118 P.2d 769 (1941); *James v. James*, 97 Colo. 413, 50 P.2d 63 (1935); *Thimgan v. Mathews*, 74 Colo. 93, 219 P. 211 (1923);

*Cordas v. Ryan*, 72 Colo. 521, 212 P. 490 (1923). Instead, sufficient evidence of cohabitation and reputation may give rise to a permissible inference of common law marriage.

6. In *Employer's Mutual Liability Insurance Co. of Wisconsin v. Industrial Comm'n*, 124 Colo. 68, 73, 234 P.2d 901, 903 (1951), we noted that evidence concerning a common law marriage "should be clear, consistent and convincing." *See also Peery v. Peery*, 27 Colo.App. 533, 150 P. 329 (1915). This language was not chosen in order to establish a higher burden of proof for those attempting to prove a common law marriage, but instead merely stresses that the parties must present more than vague claims unsupported by competent evidence.

ner of daily life, by conduct, demeanor, and habits, that the man and woman have agreed to take each other in marriage and to stand in the mutual relation of husband and wife."); *see Taylor v. Taylor*, 10 Colo. App. at 305, 50 P. at 1049 (1897) (agreement may be presumed from evidence of cohabitation and repute; general reputation or repute means "the understanding among the neighbors and acquaintances with whom the parties associate in their daily life, that they are living together as husband and wife....") The two factors that most clearly show an intention to be married are cohabitation and a general understanding or reputation among persons in the community in which the couple lives that the parties hold themselves out as husband and wife. Specific behavior that may be considered includes maintenance of joint banking and credit accounts; purchase and joint ownership of property; the use of the man's surname by the woman; the use of the man's surname by children born to the parties; and the filing of joint tax returns. *See* Mills, *Common Law Marriage in Colorado*, 16 Colo. Law. 252, 257 (1987). However, there is no single form that any such evidence must take. Rather, any form of evidence that openly manifests the intention of the parties that their relationship is that of husband and wife will provide the requisite proof from which the existence of their mutual understanding can be inferred.

▐▐ In the present case, the trial court was offered evidence that, if believed, would have established the existence of a common law marriage. In fact, the court of appeals, in reversing the trial court's ruling that no common law marriage had been established, concluded that "the uncontradicted evidence establishes, as a matter of law, the existence of a common-law marriage which had not been dissolved." *People v. Lucero*, 707 P.2d at 1042. We disagree with the court of appeals that the evidence established a common law marriage as a matter of law. A determination of whether a common law marriage exists turns on issues of fact and credibility, which are properly within the trial court's discretion. *See Lewis v. People*, 174 Colo.

334, 338, 483 P.2d 949, 951 (1971); *People v. Maes*, 43 Colo.App. 365, 368, 609 P.2d 1105, 1108 (1979). However, in ruling that no such marriage existed, the trial court gave no indication of its reasoning, and it did not make any finding that the testimony of Trujillo was lacking in credibility. Since it is not clear by what criteria the trial court evaluated the existence of the common law marriage, we now return this case to the court of appeals with directions to remand to the trial court for further findings in light of the standards we have clarified today.

### III.

We elect to address the scope of the testimonial privilege set forth in section 13–90–107(1)(a) notwithstanding the fact that the issue will become relevant only if the trial court rules on remand that a common law marriage was established. This will enable the trial court to reach a complete resolution of the question of the admissibility of Rosemary Trujillo's testimony.

▐▐ The People contend that the court of appeals erred in holding that section 13–90–107(1)(a) provides an absolute privilege with respect to the testimony of one spouse offered against another. We disagree. Section 13–90–107(1)(a) provides:

(1) There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person shall not be examined as a witness in the following cases:

(a) A husband shall not be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor during the marriage or afterward shall either be examined without the consent of the other as to any communications made by one to the other during the marriage; but this exception does not apply to a civil action or proceeding by one against the other, nor to a criminal action or

proceeding for a crime committed by one against the other.[7]

The plain language of this statute creates two distinct testimonial privileges. First, neither spouse can be examined for or against the other on any subject without the consent of that other spouse. In order for this privilege to be applicable, a valid contract of marriage must exist at the time the testimony is offered. *Archina v. People*, 135 Colo. 8, 25, 307 P.2d 1083, 1091–92 (1957). Second, during the marriage or afterward neither spouse can be examined as to any communications made by one to the other during the marriage unless the non-testifying spouse consents. *See People v. Corbett*, 656 P.2d 687, 689 (Colo. 1983) (Quinn, J., specially concurring).[8]

■ The People argue that, when considered together with the introductory language of section 13–90–107(1), subsection (a) thereof expresses the legislative purpose to "encourage confidence and to preserve it inviolate" within the marital relationship. Therefore, they contend, the privilege should be limited to confidential communications. We disagree. Even though the purpose expressed in the introductory language is narrower than the scope of the privilege set forth in section 13–90–107(1)(a), that introductory language cannot serve to negate the plain words of subsection (a) that one spouse "shall not be examined for or against" the other without the consent of that other spouse. Were we to accept the construction put forward by the People, it would render the first clause of section 13–90–107(1)(a) meaningless.

The People also urge us to follow the lead of the United States Supreme Court in *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), and narrow the privilege to what they perceive to be its valid purpose, i.e., the protection of confidential communications between spouses. *Trammel* narrowed the privilege as previously recognized in federal case law "so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying." *Id.* at 53, 100 S.Ct. at 914. *Trammel* traced the rule of spousal disqualification back to its common law origins, and noted that the rule has endured into modern times even though its doctrinal basis has long since been discredited and abandoned.[9] *Id.* at 44, 100 S.Ct. at 909. The privilege against adverse testimony by a spouse has continued to receive recognition in modern times because of "its perceived role in fostering the harmony and sanctity of the marriage relationship." *Id.* The privilege has not been without criticism, however. Professor Wigmore has termed it "the merest anachronism in legal theory and an indefensible obstruction to truth in practice," 8 Wigmore, Evidence § 2228 (1961), and the National Conference of Commissioners on Uniform State Laws drafted a proposed uniform evidentiary rule limiting the privilege to confidential communications and abolishing the rule of not requiring one spouse to testify against the other in a criminal action. *Trammel*, 445 U.S. at 45, 100 S.Ct. at 910.

The United States Supreme Court in *Trammel*, however, was free under the Federal Rules of Evidence "to continue the evolutionary development of testimonial privileges in federal criminal trials 'governed by the principles of the common law

---

7. Section 13–90–107(1)(a), 6 C.R.S. (1973), was amended in 1983 in a respect not relevant to this opinion. Ch. 187, sec. 1, § 13–90–107, 1983 Colo. Sess. Laws 663. In its present form it appears at § 13–90–107(1)(a), 6A C.R.S. (1987).

8. The statute contains certain exceptions to the privileges as set forth in the text. Another exception has subsequently been added. *See* § 13–90–107(1)(a), 6A C.R.S. (1987). None of these exceptions is relevant to the issues now before us.

9. The United States Supreme Court explained:

[S]pousal disqualification sprang from two canons of medieval jurisprudence: first, the rule that an accused was not permitted to testify in his own behalf because of his interest in the proceeding; second, the concept that husband and wife were one, and that since the woman had no recognized separate legal existence, the husband was that one. From those two now long-abandoned doctrines, it followed that what was inadmissible from the lips of the defendant-husband was also inadmissible from his wife.

*Trammel*, 445 U.S. at 44, 100 S.Ct. at 909.

as they may be interpreted ... in the light of reason and experience.'" *Trammel,* 445 U.S. at 47, 100 S.Ct. at 910 (quoting Fed.Rule Evid. 501). Our role in the present case is strikingly different. It is to construe the language of a statute, section 13–90–107(1)(a). We find the meaning to be clear. It is also consistent with the construction that this statute received when first interpreted by this court, a construction that has not been altered in the many following years. *Dill v. People,* 19 Colo. 469, 36 P. 229 (1894); *White v. Bower,* 56 Colo. 575, 136 P. 1053 (1913). *See People v. Corbett,* 656 P.2d at 689 (Quinn, J., specially concurring). We adhere to that construction today and hold that section 13–90–107(1)(a), 6 C.R.S. (1973), precludes testimony by one spouse for or against the other without the consent of the other spouse. The trial court erred in limiting the scope of the privilege to confidential communications, as the court of appeals held. *People v. Lucero,* 707 P.2d at 1042.

We return this case to the Colorado Court of Appeals to be remanded to the trial court for further proceedings. The trial court must reconsider the issue of the existence of a common law marriage, applying the standards set forth in this opinion to the evidence in the existing record. If it concludes that a common law marriage existed between the defendant and Rosemary Trujillo at the time she testified against the defendant, the judgment of conviction must be reversed. If, on the other hand, the trial court concludes that no such marriage existed at that time, the judgment of conviction should stand affirmed.

We affirm the judgment of the court of appeals in part and reverse it in part and remand the case to that court to be returned to the trial court for further proceedings consistent with this opinion.