Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/13/2021 08:08 AM CDT

Darryl Nelson, appellant, v. Elizabeth
Richardson-Nelson, appellee.

___ N.W.2d ___

Filed June 29, 2021.    No. A-20-716.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Appeal and Error.** In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Marriage: Proof.** In Nebraska, a couple cannot create a common-law marriage by agreement or cohabitation and reputation.

5. **Divorce: Property Division: Alimony.** In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.

6. **Divorce: Property Division.** In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2016), a court should consider the

income and earning capacity of each party and the general equities of the situation.

7. **Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.

8. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. The ultimate criterion is one of reasonableness.

9. ____: ____. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.

10. **Alimony.** Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award.

11. ____. Above all else, the duration of an alimony award must be reasonable.

Appeal from the District Court for Dawson County: JAMES E. DOYLE IV, Judge. Affirmed.

Brian W. Copley, of Heldt, McKeone & Copley, for appellant.

Mark R. McKeone, P.C., L.L.O., for appellee.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

MOORE, Judge.

## INTRODUCTION

Darryl Nelson (Darryl) appeals from the order of the district court for Dawson County dissolving his marriage to Elizabeth Richardson-Nelson (Elizabeth). The court found that the parties established a common-law marriage in Colorado in 1997 and awarded alimony to Elizabeth. Darryl contends that the parties were not married until 2011 in Nebraska. He also challenges the amount and duration of the court's alimony award. For the reasons set forth herein, we affirm.

## STATEMENT OF FACTS

On June 6, 2019, Darryl filed a complaint in the district court, seeking dissolution of his marriage to Elizabeth. He

- 17 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

alleged that the parties were married in Nebraska in "July, 2013 [sic]." In her answer and "Counter Complaint," Elizabeth denied this allegation and alleged that the parties were married in Colorado in July 1997. Both parties sought dissolution of the marriage and an equitable division of the marital estate. Additionally, Elizabeth sought awards of temporary and permanent alimony.

On April 8, 2020, the district court entered an order concerning temporary spousal support. The court awarded Elizabeth sole and exclusive possession of the marital residence for the duration of the pendency of the case and, as part of the award of temporary spousal support, ordered Darryl to pay the mortgage, tax, and insurance payments on the marital residence; to pay the insurance premiums for Elizabeth's automobile; and to maintain in full force and effect and pay the premiums for any health or life insurance which insured the health or life of Elizabeth as of June 6, 2019. Additionally, the court ordered Darryl to pay temporary spousal support in the amount of $300 per month commencing January 1, 2020, until further order of the court.

Trial was held before the district court on July 1, 2020. In addition to receiving various documentary exhibits, the court heard testimony from Darryl, Elizabeth, and Darryl's uncle.

The parties presented conflicting evidence regarding whether they established a common-law marriage in Colorado or were not married until after they moved to Nebraska. They were living in Colorado when they began dating in 1996, and at some point later that year, Darryl moved in with Elizabeth. The parties lived together without interruption until they separated in February 2019. On June 17, 1997, the parties obtained a marriage license in Colorado. They did not have a marriage ceremony at that time, and the license was never filed with a county clerk's office in Colorado (nor does a copy appear in the record on appeal). The parties moved to Nebraska in September 1998. They obtained a marriage license and had a wedding ceremony in Nebraska in 2011. Their Nebraska

- 18 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

license and certificate of marriage was admitted into evidence; reflects a marriage date of July 17, 2011; and was filed with the county clerk's office in Dawson County on July 18. At the time of trial, Darryl, age 42, resided in Kearney, Nebraska, and Elizabeth, age 48, resided in Lexington, Nebraska.

Darryl was asked about why the parties did not have a "follow-up ceremony" after obtaining the marriage license in Colorado. Darryl responded, "I just . . . drug my feet, I guess." When asked if it was his intention at that time to "officially" marry Elizabeth, he stated, "Intention, yes, but just never finished it." Darryl testified further, "There was never a real push for us to have a full-blown marriage — wedding." When questioned further about what kept him from filing the marriage license while the parties were in Colorado, Darryl testified that this was due to "[m]aybe cold feet a little bit . . . because [he] was so young" (19 years old). He also testified that there "wasn't a big pressure to do it because [Elizaeth and he] were already together like that. It already felt like that was the case." Darryl admitted that he began calling Elizabeth his wife and that he held her out as his wife to other people after they obtained the Colorado marriage license. Darryl testified that he purchased Elizabeth a "promise ring" in 1997 before the parties moved to Nebraska, indicating that he bought "the actual first wedding ring" after the move to Nebraska although he did not recall in what year it was purchased. Darryl testified that the parties were "officially married" at the time of the 2011 ceremony in Nebraska. When asked why he decided to "go through with a formal marriage" at that point, Darryl responded that the parties had been "going through some problems," that Elizabeth "had always wanted a ceremony," and that he thought the ceremony would help to "make the relationship stronger."

The parties did not jointly own any property and had no joint accounts while they lived in Colorado. According to Elizabeth, Darryl did not have any bank accounts at the time and her account was only maintained for purposes of

- 19 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

receiving her daughter's disability payments. She testified that the parties paid their bills in Colorado using cash. Darryl testified that the parties did not have a specific agreement about how bills would be paid or expenses divided, indicating that Elizabeth usually paid the rent while he "helped out with" other bills. Darryl testified that he did not carry Elizabeth on his medical insurance while they lived in Colorado. According to Elizabeth, Darryl did not have medical insurance during that period; Elizabeth was on Medicaid, which also covered her children; and Darryl's daughter was covered through her mother's insurance. Darryl did not recall filing a joint tax return with Elizabeth prior to moving to Nebraska, but he testified that they "[p]ossibly" did so in 1998 and that "it was for sure" for the tax years 1999 and 2000. Elizabeth estimated that the parties first filed a joint tax return in 2000 for the 1999 tax year. Transcripts from the Internal Revenue Service of Darryl's income taxes from 2008 through 2018 were received into evidence, and all show a "Married Filing Joint" filing status. Elizabeth did not have any older income tax documents and was able to obtain only the 10 years of transcripts that were received into evidence.

Elizabeth testified that she believed the parties were married after they obtained the license in Colorado. She acknowledged there was no wedding ceremony in 1997, but she believed the marriage license itself created the marriage. She described the ring Darryl gave her in 1997 as an "engagement ring," testifying, "That's when he asked me to marry him." Elizabeth confirmed Darryl's testimony that in Colorado, Darryl introduced her as his "wife" on several occasions after the commencement of their cohabitation. Elizabeth did not adopt Darryl's surname while the parties lived in Colorado; she did not legally change her surname to Richardson-Nelson until after 2011, when her driver's license expired. Elizabeth offered in evidence a cross-stitch wall plaque made by Darryl's grandmother and given to the parties. The wall plaque depicts a man and woman, bears the names "Elizabeth" and "Darryl,"

- 20 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

and includes the words "United in Love" and "July 17, 1997."
The woman depicted is wearing a wedding gown and veil and
is holding a bouquet of flowers. The man depicted is formally
dressed. The record does not indicate exactly when this gift
was given to the parties. Elizabeth testified that "[Darryl's]
mom and grandmother [were] upset because they felt like
[Darryl and Elizabeth] robbed them of them being there for
[the] wedding" and that the grandmother "made the plaque
with the date that [Darryl and Elizabeth] got married." Darryl
testified that the plaque had been displayed in their residence
at some point but "ha[d]n't been around for a long time."
Elizabeth characterized the July 2011 wedding ceremony as "a
renewal of the vows for the family to come and [her] to wear
a wedding dress."

Darryl's uncle testified that he met Elizabeth in 1998 when
the parties visited prior to moving to Nebraska. According to
the uncle, they acted like a married couple and Darryl intro-
duced Elizabeth as his wife at that time.

The parties did not have any children together; however, as
noted above, Darryl had a daughter from a prior relationship,
and Elizabeth had five children from a prior relationship. The
children lived with the parties during their Colorado cohabita-
tion and after they moved to Nebraska. Darryl testified that
he raised Elizabeth's children as his own and that Elizabeth
treated his daughter as her own. The parties' children from
prior relationships were no longer minors at the time these
divorce proceedings were initiated.

There was evidence about the parties' work history and
living expenses. Darryl has a high school education and had
started taking postsecondary education classes within the year
preceding trial. While living in Colorado, Darryl "did a lot
of odd jobs" and worked "mainly" for his grandfather. Once
the parties moved to Nebraska, Darryl did "odd jobs" and
"handyman, small construction" jobs until 2009, when the
parties moved to Lexington and he obtained employment at a
discount store. Darryl could not remember exactly how much

he earned while working at the store, estimating "[m]aybe 12 tops." In 2011, while still employed at the store, Darryl started working at Baldwin Filter, Inc. (now known as Parker) in a "temp" position earning $10 an hour. Darryl was still employed at Parker at the time of trial as an assistant supervisor in the distribution center. Darryl testified that he changed jobs within the company in May 2019 and that in 2019, he earned approximately $86,000, which included overtime pay. Darryl testified that he would earn substantially less in 2020 than in 2019, partly due to the COVID-19 pandemic. He testified that Parker planned to reevaluate allowing overtime at the end of July 2020, but that "there is no guarantee that [Parker] would even go back to the rate that [its employees] were getting before." Darryl's W-2 forms for 2017 and 2018 were received into evidence and show "[w]ages, tips, other compensation" of $59,821.79 and $77,200.95, respectively. Darryl testified generally as to his living expenses but did not provide a specific description of his financial condition. Although a "Statement of Monthly Expenses" for Darryl is listed in the index to the bill of exceptions before us, this exhibit was not made a part of the record on appeal.

Elizabeth has a diploma through the GED program, and at the time of trial, she had both a cosmetology license and a lapsed certified nursing assistant (CNA) license. When the parties moved to Nebraska, Elizabeth obtained work cleaning a recreation center; she also worked at retail stores. Darryl estimated that the parties' combined annual income at the time of the move to Nebraska was "[p]robably, high 20s." At some point after the parties moved to Nebraska, Elizabeth received training and worked as a CNA, earning more than Darryl. The parties agree that Elizabeth's earnings were their primary income for a number of years from some point after their move to Nebraska until Darryl began receiving promotions at Parker. While working as a CNA, Elizabeth obtained a cosmetology degree. She then worked as a hairdresser in a beauty salon during the latter parts of the parties' marriage,

- 22 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

but, due to the COVID-19 pandemic, had stopped that work. Just a few weeks prior to trial, she had started working 10 hours per week at a gas station convenience store, earning $9.50 per hour. She indicated that she had been talking to the owner about "trying to pick up hours" at a different store location. She also testified that beauty salons had just recently reopened after closing due to the pandemic. She had been talking to the owner of the salon where she worked prior to the pandemic and indicated that the owner wanted Elizabeth to pay "back-rent" for the months during which the salon had been closed, but that Elizabeth did not have this money available. According to Elizabeth, she had been making about $400 per month net pay prior to the pandemic. In his testimony, Darryl estimated that Elizabeth had earned "probably mid-20s, annually," while working as a hairdresser. According to Elizabeth, she was looking for better-paying employment in Lexington. She testified that her CNA license had lapsed and that she would have to become recertified, but that she would not mind returning to that work because she "miss[ed] it." She also expressed that she still had her cosmetology license and "love[d] doing hair," but that "right now, it's not a good market for it because of the COVID." During her testimony, Elizabeth described her living expenses, and she submitted a written statement of her financial condition, showing total monthly expenses of $2,478.

On September 3, 2020, the district court entered a decree, dissolving the parties' marriage. The court determined that the parties established a common-law marriage in Colorado in 1997. The court divided the marital estate and ordered Darryl to pay Elizabeth a judgment of $5,500 in four equal annual payments of $1,375. We note that in the property division, Darryl was awarded the only retirement asset of the parties, Elizabeth was awarded the marital residence and ordered to pay the mortgage on it, and Darryl was ordered to pay marital debts other than the mortgage. The court ordered Darryl to

pay alimony of $1,050 per month, commencing October 1, 2020, and continuing through October 1, 2030. It also entered a judgment of $2,725.51 against Darryl for unpaid temporary alimony and interest which had accrued as of September 1, 2020. Finally, the court entered a judgment against Darryl in favor of Elizabeth for attorney fees in the amount of $750. We have set forth details of the court's discussion of the common-law marriage and alimony issues in our analysis below.

Darryl subsequently perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Darryl asserts that the district court abused its discretion in (1) finding that the parties established a common-law marriage in Colorado in 1997 and (2) calculating the amount and duration of the alimony award to Elizabeth.

## STANDARD OF REVIEW

[1] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

[2] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

[3] In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021). However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

- 24 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

## ANALYSIS

*Common-Law Marriage.*

Darryl asserts that the district court abused its discretion in finding that the parties established a common-law marriage in Colorado in 1997. He argues that the evidence was insufficient to establish the existence of a common-law marriage between the parties prior to when they moved to Nebraska.

[4] In Nebraska, a couple cannot create a common-law marriage by agreement or cohabitation and reputation. *Spitz v. T.O. Haas Tire Co.*, 283 Neb. 811, 815 N.W.2d 524 (2012) (discussing requirements for establishing common-law marriage in Colorado and upholding trial court's ruling finding evidence did not establish common-law marriage). However, Neb. Rev. Stat. § 42-117 (Reissue 2016) provides that "[a]ll marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted, shall be valid in all courts and places in this state." See, also, *Bogardi v. Bogardi*, 249 Neb. 154, 542 N.W.2d 417 (1996) (general rule is that validity of marriage is determined by law of place where it was contracted; if valid there, it will be held valid everywhere, and conversely, if invalid by lex loci contractus, it will be invalid wherever question may arise). Accordingly, for Elizabeth's asserted marriage date to be correct, she had to show that she and Darryl had a valid common-law marriage under Colorado law before September 1998, when they moved to Nebraska.

In finding the evidence showed that the parties established a common-law marriage in Colorado prior to moving to Nebraska, the district court relied on *People v. Lucero*, 747 P.2d 660 (Colo. 1987). Since entry of the decree in this case, the prevailing test for establishing a common-law marriage in Colorado set forth in *Lucero* has been refined by the Colorado Supreme Court in *Hogsett v. Neale*, 478 P.3d 713 (Colo. 2021). Although the *Hogsett* opinion was not available to the district court at the time of the decree in this case, for the sake of completeness, we discuss both cases before proceeding to the

- 25 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

district court's analysis of whether a common-law marriage was established in this case.

*People v. Lucero, supra*, was a criminal case in which the defendant objected to testimony from his alleged common-law wife on the grounds that it violated Colorado's marital testimonial privilege. The defendant made an offer of proof during which the putative wife testified that she considered herself married to the defendant, testified that they held themselves out to friends as being married, and affirmed that the defendant agreed they were married. She also repeated earlier testimony about the length of their marriage (5 years) and that they had one child together. The trial court found the proffered testimony insufficient to prove the common-law marriage and overruled the defendant's objection. The Colorado Court of Appeals reversed, finding the existence of a common-law marriage as a matter of law. On review, the Colorado Supreme Court reversed that conclusion and remanded the matter for reconsideration by the trial court under the standards set forth in its opinion.

In *Lucero*, the Colorado Supreme Court held that a common-law marriage is established by "the mutual consent or agreement of the parties to be husband and wife, followed by a mutual and open assumption of a marital relationship." 747 P.2d at 663. The court acknowledged that in many cases, because of the nature of common-law marriage, express agreements will not exist, and it held that "if the agreement is denied or cannot be shown, its existence may be inferred from evidence of cohabitation and general repute." *Id.* at 664. The court emphasized that "determination of whether a common-law marriage exists turns on issues of fact and credibility, which are properly within the trial court's discretion." *Id.* at 665. The court went on to provide the following examples of evidence that could establish a mutual understanding of the parties that they had a marital relationship:

> The two factors that most clearly show an intention to be married are cohabitation and a general understanding

- 26 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

or reputation among persons in the community in which the couple lives that the parties hold themselves out as husband and wife. Specific behavior that may be considered includes maintenance of joint banking and credit accounts; purchase and joint ownership of property; the use of the man's surname by the woman; the use of the man's surname by children born to the parties; and the filing of joint tax returns. . . . However, there is no single form that any such evidence must take. Rather, any form of evidence that openly manifests the intention of the parties that their relationship is that of husband and wife will provide the requisite proof from which the existence of their mutual understanding can be inferred.

*Id.* Since it was not clear by what criteria the trial court in *Lucero* evaluated the existence of a common-law marriage, the Colorado Supreme Court remanded the matter for reconsideration under the clarified standard set forth in its opinion.

The decree in the present case was entered on September 3, 2020. In an opinion released on January 11, 2021, the Colorado Supreme Court further refined the test from *Lucero* in its opinion in *Hogsett v. Neale*, 478 P.3d 713 (Colo. 2021). *Hogsett* was a case involving a disputed common-law marriage in a dissolution of marriage case filed by one partner in a same-sex relationship. In *Hogsett*, the court discussed the legal and social developments with respect to marriage in the years since its decision in *People v. Lucero*, 747 P.2d 660 (Colo. 1987). The Colorado Supreme Court then refined the *Lucero* test as follows:

Given these significant social and legal developments since our decision in *Lucero*, the test and its factors require refinement. We therefore hold that a common law marriage may be established by the mutual consent or agreement of the couple to enter the legal and social institution of marriage, followed by conduct manifesting that mutual agreement. The key question is whether the parties mutually intended to enter a *marital* relationship—that

- 27 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

is, to share a life together as spouses in a committed, intimate relationship of mutual support and mutual obligation. In assessing whether a common law marriage has been established, courts should give weight to evidence reflecting a couple's express agreement to marry. In the absence of such evidence, the parties' agreement to enter a marital relationship may be inferred from their conduct. When examining the parties' conduct, the factors identified in *Lucero* can still be relevant to the inquiry, but they must be assessed in context; the inferences to be drawn from the parties' conduct may vary depending on the circumstances. Finally, the manifestation of the parties' agreement to marry need not take a particular form.

*Hogsett*, 478 P.3d at 723-24.

In the present case, the district court noted the parties' respective testimonies about the history of their relationship, their intent with respect to and understanding of the effect of the Colorado marriage license they obtained but did not file in July 1997, the rings purchased by Darryl for Elizabeth at various points, how the parties handled their mutual finances, how they represented themselves to family and friends, and the parties' testimony about the purpose and effect of the wedding ceremony in Nebraska in 2011. The court then observed that pursuant to the standard set forth in *Lucero*, the determination of whether there is a common-law marriage turns on issues of fact and credibility, the evidence must manifest the parties' intent to have a marital relationship, the relationship does not have to be of any certain duration, and it does not require any specific words or acts to manifest the parties' mutual consent or agreement to be married. The court then stated:

After consideration of the evidence described above and particularly the credibility of the parties, the court finds the parties established, in Colorado, a common-law marriage in July 1997 during their cohabitation. While in the state of cohabitation in Colorado, Darryl referred to Elizabeth as his wife to Elizabeth and to others. They

- 28 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

shared the household duties commonly required of a hus-
band and a wife, and, the status as of 1997, of husband
and wife was recognized as such by Darryl's uncle and
grandmother. The conflicts in the evidence over the effect
of the Colorado marriage license and the purpose of the
2011 wedding ceremony are resolved in Elizabeth's favor.
In making this determination the demeanor evidence was
significant and weighed heavily in Elizabeth's favor.

The court concluded that the parties' Colorado common-law
marriage commenced in late July 1997 and resolved other
issues in the case based on such finding.

Our review supports the district court's conclusion. The
parties began cohabitating in Colorado in 1996 and obtained
a marriage license in Colorado in July 1997, although they
never filed it and did not hold a wedding ceremony at that
time. The evidence shows that Darryl referred to Elizabeth as
his wife and that they held themselves out to friends and fam-
ily as being married at that time. There was evidence that both
Darryl's uncle and his grandmother believed the parties were
married in Colorado in 1997. The parties continued to live
together and maintain a common household until their separa-
tion in February 2019 after moving to Nebraska in September
1998. Although they did not have joint bank accounts or
jointly own any property while living in Colorado, the evi-
dence shows that they rented their residence, that Darryl did
not have a bank account, that Elizabeth maintained a bank
account only for purposes of receiving her daughter's disabil-
ity payments, and that the parties mainly conducted their busi-
ness by cash while living in Colorado. Elizabeth did not use
any portion of Darryl's surname as her own until at some point
after the parties' Nebraska wedding ceremony in 2011, but as
pointed out by the Colorado Supreme Court in its recent deci-
sion, "there may be any number of reasons, including cultural
ones, that spouses and children do not take one partner's name
at marriage," and this does not appear to be a factor weighed
heavily by the district court in the present case. *Hogsett v.*

- 29 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

*Neale*, 478 P.3d 713, 723 (Colo. 2021). The parties did not have any children but raised one another's children from previous relationships as their own. The record is unclear as to whether the parties filed any income tax returns while living in Colorado, but testimony from both Darryl and Elizabeth establishes that they began filing joint tax returns soon after moving to Nebraska. The documentary evidence shows that they filed joint tax returns at least as early as 2008, which is 3 years prior to the Nebraska wedding ceremony. Finally, the evidence as to the parties' understanding and intent with respect to the 1997 Colorado marriage license, the 2011 Nebraska wedding ceremony, and the rings purchased by Darryl for Elizabeth at various points was conflicting. The district court clearly resolved that conflict in Elizabeth's favor.

The district court did not err in determining that the evidence showed the parties established a common-law marriage in Colorado in 1997 before moving to Nebraska in 1998. As noted above, this determination turns on issues of fact and credibility, which are within the trial court's discretion. See *People v. Lucero*, 747 P.2d 660 (Colo. 1987), *abrogated, Hogsett, supra*. The court did not abuse its discretion in finding a common-law marriage established in 1997. This assignment of error fails.

*Alimony.*

Darryl asserts that the district court abused its discretion in calculating the amount and duration of the alimony award to Elizabeth. In the decree, the court ordered Darryl to pay alimony of $1,050 per month beginning October 1, 2020, and continuing through October 1, 2030. Darryl argues that the award was patently unfair; in doing so, he relies on his assertion that the court erred in determining the length of the parties' marriage. He also argues that the court failed to consider Elizabeth's contributions to the marriage, especially during the period when she earned more than Darryl; her potential to renew her CNA license and earn more than she was earning at the time of trial; the reduction in Darryl's income at the

- 30 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
30 NEBRASKA APPELLATE REPORTS
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

time of trial; and the fact that there were no minor children in the home.

[5,6] In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2016), a court should consider the income and earning capacity of each party and the general equities of the situation. *Dooling v. Dooling, supra*.

[7-11] The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.* In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id.* The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.* Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Grothen v. Grothen*, 308 Neb. 28, 952 N.W.2d 650 (2020). Above all else, the duration of an alimony award must be reasonable. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018).

In awarding alimony, the district court found that the parties had been married for 21 years 10 months as of the date of their separation and 23 years as of the date of trial and that the length of the marriage supported an award of alimony. It noted the parties' ages and observed that they were both in good health. The court noted the parties' current financial

circumstances, including the impact of the COVID-19 pandemic on their respective employments. The court found that Elizabeth had an earning capacity of at least $1,560 per month. It also noted evidence relating to the parties' living expenses and the equal division of the marital estate. The court concluded that the evidence relating to the parties' financial circumstances weighed in favor of alimony. Next, the court observed that the parties made equal contributions to the marriage in terms of the care they provided their children from other relationships and the operation of the household. The court also noted that Elizabeth contributed more to the parties' financial well-being early in the marriage, while in the last few years, Darryl began earning substantially more than Elizabeth. The court concluded that an analysis of the parties' contributions to the marriage weighed in favor of an award of alimony. In sum, the court concluded that consideration of the evidence with respect to the factors relevant to an award of alimony all supported an award of alimony to Elizabeth.

Our de novo review of the record supports the district court's award of alimony. As determined above, this was a lengthy marriage. Both parties made contributions to the marriage in helping raise the parties' children from other relationships. Elizabeth's financial contributions were greater at the beginning of the marriage; Darryl's were greater at the end of the marriage. The economic circumstances of both parties suffered in the months preceding trial due to the COVID-19 pandemic, but there was still a considerable disparity in their relative economic circumstances at the time of trial. Elizabeth testified that she was unable to pay the "back-rent" required to resume work as a hairdresser and that returning to work as a CNA will require her to renew her license. Darryl's testimony reflects the possibility of overtime work's becoming available again through his employment. While the alimony is not a tool to equalize the parties' income, under the circumstances presented here, we cannot say that the court's award of alimony was unreasonable or patently unfair. See, *Grothen*

- 32 -

Nebraska Court of Appeals Advance Sheets
30 Nebraska Appellate Reports
NELSON v. RICHARDSON-NELSON
Cite as 30 Neb. App. 15

*v. Grothen, supra*; *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). The court considered the appropriate factors, and we find no abuse of discretion either in the amount or in the duration of the alimony award.

## CONCLUSION

The district court did not abuse its discretion in finding that the parties established a common-law marriage in Colorado in 1997 or in calculating the amount and duration of the alimony awarded to Elizabeth.

Affirmed.