IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

BRISSO V. BRISSO

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MARK A. BRISSO, APPELLANT,

V.

TRACY A. BRISSO, APPELLEE.

Filed April 12, 2022.    No. A-21-234.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed in part, and in part reversed and vacated.

Bradley E. Marsicek, of Cordell Law, L.L.P, for appellant.

Jane F. Langan Mach and Alex M. Lierz, of Rembolt Ludtke, L.L.P, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

### INTRODUCTION

Mark A. Brisso appeals from the Lancaster County District Court's decree dissolving his marriage to Tracy A. Brisso and the subsequent denial of his motion to alter and amend. For the reasons stated herein, we affirm in part, and in part reverse and vacate as more fully set forth herein.

### STATEMENT OF FACTS

Mark and Tracy were married in June 1995. They had one child who is now an adult. When the parties married, Mark was in his second year of medical school and worked part-time as a pharmacist. Although Tracy was employed full-time as a nurse when the parties married, about 1 year later, she was assaulted at work sustaining nerve and tissue damage to her arm. After the assault, Tracy initially stayed at home to heal from her injuries and care for the parties' minor child

- 1 -

who was born in 1997. She returned to work on a part-time basis performing light duty work until she was laid off sometime in 1998. Due to her workplace injury, Tracy was compensated for her lost wages and future medical expenses in the amount of $198,000.

When Mark completed medical school in 2003, the parties relocated to Illinois for Mark's fellowship program. Tracy obtained part-time employment as a nurse at a jail. The parties resided together for about a year until 2004 when Tracy and the parties' child moved to Council Bluffs, Iowa, due to marital discord. Tracy transferred her employment to work part-time as a nurse in Douglas and Pottawattamie counties. After Mark completed his fellowship in 2006, he obtained a position in Lincoln, Nebraska. Although he stayed with Tracy for three weeks in Council Bluffs, he subsequently purchased a home in Lincoln as his job required him to reside within a certain proximity to the hospital. Despite maintaining separate households, Mark and Tracy remained married, took vacations as a family and as a couple, spent holidays together, and maintained a joint bank account. Additionally, Mark testified that he continued to pay Tracy's monthly expenses of approximately $5,500 in addition to paying for their child's expenses.

From 2006 until 2010, Tracy was the director of nursing with a company responsible for providing nursing care at the Douglas County Correctional Facilities. During this time, Tracy worked between 30 to 40 hours per week and earned $41,685 in 2006; $50,414 in 2007; $65,621 in 2008; $67,373 in 2009; and $49,225 in 2010. She testified that she left that position in 2010 when the company was purchased. She returned to part-time work as a nurse with the Pottawattamie County Jail system from 2010 to 2018.

In September 2018, Mark filed a complaint for dissolution and, in response, Tracy filed an answer and counterclaim for dissolution. In May 2019, Tracy filed a motion for temporary alimony alleging that she was disabled and needed support during the pending litigation. Thereafter, Mark discontinued his monthly payments to cover Tracy's expenses. Following a hearing on Tracy's motion, the court ordered Mark to pay $10,000 temporary alimony per month retroactive to May 2019, subtracting obligations paid on Tracy's behalf by Mark.

Because the parties disagreed about Tracy's disability status and her earning capacity, during discovery, Tracy filed a motion for temporary expert and attorney fees relating to that issue. In January 2020, the court ordered Mark to pay $2,500 for Tracy's disability assessment and $7,500 toward Tracy's legal fees. Mark paid the fees as ordered.

The trial was held over 4 days in June and August 2020. Mark testified on his own behalf and also called as witnesses Bruce Wilkie, an appraiser, and Jack Greene, a vocational expert. Tracy testified on her own behalf and called additional witnesses including Dr. Kelly Pierce, a friend and expert witness; Jane Yaffe-Rowell, a vocational expert; Judy Wilson, an appraiser; and Larry Morris, Tracy's father. The court received numerous exhibits including discovery requests and responses, evidence of payments, joint tax returns, paystubs and earning histories, monthly expenses, evidence of debts, valuation reports, bank account summaries, insurance and retirement accounts, credit reports, tax debt summaries, student loan documents, business information, credit card spending habits and payments, medical reports, invoices, and pictures and documents relating to Tracy's recreational activities and trips.

During trial, Tracy urged that she needed alimony to cover her monthly expenses as she was unable to be employed due to her medical conditions. Tracy's physician and acknowledged

friend, Dr. Pierce, testified that, in 2019, he completed an application for Social Security (SSA) disability at Tracy's request. In connection with that application, Dr. Pierce indicated that Tracy had left arm neuropathy relating to a traumatic injury occurring in 1996 and had chronic laryngeal spasms. In a separate report, Dr. Pierce indicated that Tracy was unable to sit for more than 20 minutes, stand for more than 15 minutes, or lift more than 20 pounds. Although Dr. Pierce acknowledged that, prior to October 16, 2019, he had not placed any work restrictions on Tracy, he testified that Tracy was unable to work in a competitive work environment. Dr. Pierce said that Tracy's recreational activities did not change his opinion about her ability to work because "[i]t's my opinion, in conjunction with the patient, to decide what you can and can't do at that point in time" and that "I always [err] on the side of caution and tell my patients . . . if I think they have a medical problem where they can get hurt, I advise them to be careful and tailor their activities to what they know they can and can't do."

Tracy also called Yaffe-Rowell, a vocational expert, to testify regarding Tracy's employability. Yaffe-Rowell opined that Tracy would likely not be able to return to work as a general duty nurse, but that she would be able to perform more sedentary jobs after taking steps to reinstate her nursing license or she could take another suitable job unrelated to nursing. However, Yaffe-Rowell acknowledged that Tracy's laryngeal spasms and mental health would cause her to miss more than 4 days of work per month. Yaffe-Rowell concluded that, if Tracy could manage her breathing episodes, she might be more employable. On cross-examination, Yaffe-Rowell admitted that she did not complete a functional capacity evaluation of Tracy and relied mostly on Dr. Pierce's medical report in rendering her opinion. In response to a question about the connection between alcohol use and Tracy's breathing-related episodes, Yaffe-Rowell further acknowledged that if Tracy experienced breathing issues only in connection with alcohol use, this information could be relevant to Yaffe-Rowell's assessment as to whether the respiratory condition affected Tracy's employability. Although Yaffe-Rowell testified that she was aware of some of Tracy's active lifestyle, she acknowledged she was not aware that Tracy completed multiple kayaking challenges or the full extent of the physicality of the challenges which sometimes lasted between 10 and 12 hours. Further, Yaffe-Rowell acknowledged that she was unaware that 3 weeks prior to Dr. Pierce writing his report, upon which she relied in forming her opinion, Tracy had completed a 72-mile kayaking challenge in 12 hours. Yaffe-Rowell indicated that Tracy could perform lower intensity nursing jobs that did not involve heavy lifting or require the application of fine motor skills with her dominant hand. Further, regarding Tracy's inability to work, Yaffe-Rowell indicated that Tracy could only work if her breathing issues were controlled.

In response, Mark called Greene, a vocational expert, to testify regarding Tracy's employability and earning capacity. Greene testified that many of the medical concerns reported by Tracy and documented by Dr. Pierce were inconsistent with Tracy's demonstrated active lifestyle. Greene testified that, in an interview, Tracy self-reported that she had specific physical limitations such as breathing issues and the inability to reach forward with her upper extremities, to participate in prolonged activities, or to lift items unless they were light such as a dinner plate. However, Greene noted that Tracy's self-reporting was inconsistent with Tracy's demonstrated active lifestyle which included running half marathons, being an avid cyclist participating in a 3-day 100-mile bike ride, and participating in multiple kayak challenges ranging from 50 to 72

miles lasting for extended periods of time. Greene further noted that Tracy's treating physicians had not previously reported Tracy's inability to perform work activities prior to 2019 and opined that Dr. Pierce failed to provide medical evidence of disability. He further testified that Tracy's disability claim was discredited by the SSA's denial of her 2019 application for disability benefits.

Greene ultimately opined that, having reviewed and considered Tracy's medical records, her SSA rejection letter, her history of recreational activities, his interview with Tracy, and his research into the steps Tracy would need to pursue to regain her nursing license, that Tracy had the capacity to return to work as a registered nurse for an estimated median annual wage of $63,810. He also opined that Tracy could obtain employment as a cardiac monitor technician or phlebotomist at a starting salary ranging between $26,000 to $36,000 per year and median wages of $34,910 to $46,210.

In February 2021, the court entered an order dissolving the parties' marriage. The court awarded both parties the property in their possession except that Mark was awarded the four-wheeler trailer stored at Tracy's home and Tracy was awarded possession of certain antiques, a margarita machine, liquor shelf, clock, any plant stands, and their son's baby book. Additionally, property located in a storage shed was divided equally with each party to take turns selecting items with witnesses present. Mark was awarded all interest and debts in his business known as M&R Properties and Tracy was awarded the Council Bluffs residence valued at $359,600. The Lincoln home had been sold and proceeds in the amount of $202,147.84 were placed in escrow. Of that amount, $192,147.48 remained in escrow at the time of the trial due to a $10,000 authorized withdrawal by Mark to cover his temporary alimony obligation. The court awarded Mark $91,033.92 of the proceeds from the Lincoln home taking into consideration the $10,000 authorized withdrawal and awarded Tracy $101,033.92.

The court awarded each party the bank accounts held in their respective names. Further, the court determined that Mark's student loans were premarital property because Mark had not established what portion of his student loans were incurred during the marriage or were attributable to family expenses. The court found that the parties' 2018 and 2019 tax debt was nonmarital debt which it ordered Mark to pay. The court also accepted the parties' stipulation to a 25 percent reduction in the retirement accounts since the accounts were nonqualified tax-deferred accounts. The court awarded Mark the Fidelity 457(b) retirement account and Bryan Health 401(k) plan and awarded Tracy the IPERS retirement plan. In its order, the court stated:

> The Court finds that the proposed division is slightly in [Tracy's] favor and, given the Court's authority to award each party 1/3 to 2/3 of the total marital estate, declines to order equalization.
>
> The Division of Assets and Debts contained in attached exhibit "A" is fair and reasonable, is not unconscionable, and should be, and hereby is, approved by this Court.

The court next determined the award of alimony considering the parties' circumstances, duration of the marriage, each party's history of contributions to the marriage, Tracy's need for job training, Tracy's contributions to her spouse's education, the income and earning capacity of each party, potential future inheritance to the payor/payee spouse, pensions, income earned during the marriage and how it was spent, the effect of the marriage on the ability of recipient to secure

future employment, the physical and mental stability of the recipient spouse, interruptions of personal careers or educational opportunities, and the general equities of the situation.

At the time of the dissolution, the court noted that the parties were 50 years old, that they had been married for 25 years but had maintained separate households since 2004, that there was a significant amount of spending during the marriage and separation, and that Mark had been the primary source of income supporting Tracy and the parties' minor child until 2018 when Mark began a new relationship. The court determined that although the parties maintained separate households, they still acted as a married couple until 2018.

The court found that Tracy was the primary caretaker of the parties' son and, after Tracy moved to Iowa in 2004, she became the child's sole caregiver. The court found that Tracy contributed to Mark's education noting that, when the parties were first married, Tracy worked and supported Mark while he attended medical school and his fellowship, while Mark worked part time as a pharmacist. Additionally, the court found that Tracy's career opportunities were interrupted due to her relocating with Mark while he was pursuing his medical education and because, a year into the parties' marriage, Tracy sustained a workplace injury which permanently damaged her left arm. The court noted that, although Tracy received a $198,000 settlement for lost wages and future medical expenses, the parties had no specific recollection as to how the settlement was spent other than to pay the parties' expenses and debts, but that the parties agreed that the settlement was not set aside to pay for Tracy's future medical expenses. Tracy later returned to work full time from 2005-2010 and part-time from 2010-2018, but allowed her nursing license to lapse in 2019 stating that she forgot to renew it. As a result, the court indicated that Tracy had almost no earnings for the past 5 years and was in the process of reapplying for disability benefits due to her prior injury and additional medical conditions that arose in 2017.

The court found that Mark earned $750,000 the previous year and that his lowest earnings in the last 5 years amounted to $479,000 in 2018, which the court used in setting the temporary alimony award. The court also considered the parties' retirement accounts for expected future income but determined that the value of those accounts was relatively minimal and that there were no significant assets from which Tracy could expect to receive interest in the future.

At the time of trial and in her request for temporary alimony, Tracy indicated that she was unable to work due to her workplace injury and additional medical conditions which arose in 2017. Tracy stated that she took multiple medications and suffered from anxiety and depression. As a result of these claims, the court heard expert witness testimony to determine Tracy's earning capacity. The court found that the reports and testimony from the vocational experts provided that since Tracy had not worked since January 2018, Tracy would need additional job training or certifications to reenter the workforce. Although Tracy's vocational expert and physician both testified that Tracy was unemployable for medical reasons, the court acknowledged that Tracy's recreational activities and active lifestyle, which included high intensity fitness training, biking, and competitive kayak races lasting 12 hours, "bring[s] that opinion into question." The court stated that even though Tracy had some medical issues which limited her ability to work in her original capacity as a nurse, there were other opportunities for her to pursue and Tracy had some ability to be employed even if she needed some accommodations.

The court further considered the parties' expenses in comparison to their total income. Mark provided the court with an expense worksheet detailing his proposed expenses which he argued approximated $14,000 per month not including his monthly $10,000 temporary alimony obligation to Tracy. Tracy submitted evidence of her proposed expenses which she argued approximated $10,000 per month with an estimated budget of $14,000 in anticipation of having to pay the costs of items currently paid by Mark such as health insurance, allotments to pay for home repairs, and funds to replace her 11-year-old vehicle.

After considering the relevant factors, the court ultimately determined that the equities weighed in favor of an award of alimony and granted Tracy $14,000 per month for 72 months. Further, the court ordered that Mark maintain a $1,008,000 life insurance policy naming Tracy as the beneficiary. Additionally, based upon the court's finding that Mark's attempt to force a dissolution of marriage into an adjudication of Tracy's disability had increased the amount of attorney fees and expert witness fees, the court ordered Mark to reimburse Tracy for $8,763.76 in expert fees and pay $60,000 towards Tracy's attorney fees related to that issue to be paid within 30 days of the court's order.

Following the entry of the dissolution decree, Mark timely filed a motion to reopen and enlarge the record, reconsider, and alter or amend the judgment asserting that the court's finding was verbatim to Tracy's proposed decree which contained multiple inaccurate findings that were contrary to evidence and testimony and resulted in a gross inequity in favor of Tracy. Mark requested that the court reopen and enlarge the record for further evidence regarding income so it could properly be considered; to alter or amend the judgment due to the inaccuracies in the findings; to reconsider the alimony award as it was unjust, unfair and grossly inequitable; to reconsider the determinations as to Mark's student loans and the life insurance policy ordered by the court; and to alter and amend the decree related to the personal property division. Finally, Mark objected to the court's award of attorney and expert fees. The court overruled Mark's motion. Mark has timely appealed to this court.

ASSIGNMENTS OF ERROR

Mark assigns as error, renumbered and restated, that the district court abused its discretion in (1) awarding Tracy alimony amounting to nearly 70 percent of Mark's monthly income; (2) ordering Mark to pay $60,000 in attorney fees and $8,763.76 in expert fees to Tracy; (3) permitting the expert testimony of Dr. Pierce when he was an undisclosed expert and failed to perform sufficient examination or testing to provide an opinion as to Tracy's ability to work; (4) finding that Mark's student loan debt was nonmarital property; and (5) its division of the parties' marital estate including awarding Mark all of the retirement accounts, allocating most of the debt to him, and awarding Tracy nearly all of the cash assets.

STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*.

When evidence is in conflict, an appellate court considers and may give weight to the fact that a trial court heard and observed the witnesses and accepted one version of the facts rather than another. *White v. White,* 304 Neb. 945, 937 N.W.2d 838 (2020).

## ANALYSIS

Before addressing Mark's assigned errors, we note that Neb. Rev. Stat. § 42-365 (Reissue 2016) provides, in pertinent part:

> While the criteria for reaching a reasonable division of property and a reasonable award of alimony may overlap, the two serve different purposes and are to be considered separately. The purpose of a property division is to distribute the marital assets equitably between the parties. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate.

Alimony, child support, and property settlement issues must be considered together to determine whether a court has abused its discretion. *Salmon v. Salmon*, 219 Neb. 899, 367 N.W.2d 142 (1985).

### ALIMONY

Mark first contends that the district court abused its discretion in the amount of temporary and permanent alimony awarded to Tracy. He argues that the award is unreasonable because it constitutes nearly 65 percent to 71.78 percent of his monthly income.

Section § 42-365 provides in part:

> When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party. Reasonable security for payment may be required by the court.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id*.

In *Nelson v. Richardson-Nelson*, 30 Neb. App. 15, 30, 964 N.W.2d 463, 473 (2021), this court explained:

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id*. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id.* The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.* Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Grothen v. Grothen*, 308 Neb. 28, 952 N.W.2d 650 (2020). Above all else, the duration of an alimony award must be reasonable. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018).

Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. *Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851 (1986). However, disparity in income or potential income may partially justify an award of alimony. *Id*. In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Id*. The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007).

Here, the court awarded Tracy temporary monthly alimony of $10,000 retroactive to May 1, 2019. In order to pay the temporary alimony award, Mark testified that he had to take a $20,000 loan from his 401K. Due to financial difficulties caused, in part, by the tax consequences of the alimony award and COVID-19 affecting his income, Mark filed a motion with the court requesting a reduction in the temporary alimony award. The court did not reduce Mark's temporary alimony obligation and, in the dissolution decree, awarded Tracy alimony of $14,000 per month for 72 months. In making this determination, the court stated that it considered the parties' circumstances including Tracy's workplace injury and the disruptions in Tracy's career due to Mark's pursuit of his medical career. Additionally, despite finding that Tracy was able to work, the court ordered Mark to pay alimony in the amount of $14,000 per month for 72 months, an amount which reflects the full amount of Tracy's claimed monthly expenditures.

Mark generally makes two separate arguments in connection with his claim that the court's alimony award was an abuse of discretion. First, he argues that the $14,000 monthly award approximates nearly 70 percent of his average $20,000 net monthly base salary placing the award beyond his ability to pay. Second, he argues that the award is not equitable when considering that Tracy inflated her actual monthly expenses, Tracy's ability to work, and the unfairness of the allocation in light of the overall circumstances present in this case. We address each of those arguments separately.

First, although Mark argues that the alimony award approximates nearly 70 percent of his average $20,000 monthly net base salary placing the award beyond his ability to pay, this argument fails to consider the additional bonus payments he receives in addition to his base monthly salary. Mark acknowledges that in the four years preceding trial, his total gross compensation, inclusive of bonuses, ranged from $479,095 in 2018 to $650,350 in 2016, with a gross income of $634,879

in 2019. On average, when Mark's bonuses are considered in connection with his base salary, his after-tax income is sufficient to cover both the alimony award and his acknowledged personal monthly expenses of $14,000. Although Mark will need to budget his bonus payments to account for the timing of his $14,000 monthly alimony obligation, the record does not present a situation where Mark is unable to afford the alimony award. This specific argument fails.

Mark next argues that the award is not equitable when considering the inflation of Tracy's actual monthly expenses, her ability to work in the future, and the unfairness of the allocation in light of the overall circumstances here. Again, we will address each of those arguments.

Mark first argues that Tracy's proposed monthly expenditures were over inflated. Tracy's proposed monthly expenditures appear to be derived from her expense sheet in her amended pretrial memorandum listed as Exhibit 115. In that exhibit, Tracy itemized expenditures totaling $10,154 per month and argued at trial the expenditures do not take into account her new monthly obligation once she takes over her own health insurance premium, a car payment when she replaces her 11-year-old vehicle, and the numerous repair costs she has in connection with her house which both parties agreed was in need of substantial repair. She estimated her total obligation would approximate nearly $14,000 per month. Mark takes issue with numerous individual purported monthly expenditures such as her monthly pet bill, gift allowances, retirement contributions, clothing allowance, restaurant and food allowance, and monthly mortgage obligation (once it is refinanced), all of which he claims were inflated. But Mark does not take issue with his own proposed monthly expense obligation of $14,000 which he claimed was not inflated. The reality is, as the district court noted, both individuals had become accustomed to significant personal spending habits during their 25-year marriage as reflected by the lack of general assets to be divided by the court. Under these circumstances, we cannot say the court abused its discretion in not finding that Tracy's monthly expense allowance was overinflated at the time of trial.

Second, Mark argues that the court clearly found that Tracy had worked and would continue to have the capacity to work, as evidenced by awarding 50-year-old Tracy six years of alimony, yet the court did not account for Tracy's earning capacity in awarding Tracy alimony equal to the full amount of her claimed monthly expenses for six years. We acknowledge the logic of this argument in that the alimony awarded by the district court fully covers Tracy's proposed monthly expenditures for six years without regard to the production of income by her during that period. As it relates to this issue, we agree with the district court that, notwithstanding Tracy's claimed inability to work, the record supports a finding that Tracy can return to work in some capacity in the future. That said, Tracy will need some period of time to renew her nursing license or pursue a different occupation and find suitable employment which will sustain her after her alimony award expires in six years. We consider those factors along with the factors set forth in Mark's third argument below in rendering our opinion in connection with this argument grounded in the equity of the award.

In his third argument, Mark contends that, when considering his income over the past four years, his average annual gross income, adjusted for taxes, results in Mark paying nearly 45 percent of his net income to Tracy for the next six years. He argues that when considering all the circumstances, including the fact that Tracy can work, the award constitutes an abuse of discretion.

In reviewing this award, we are confronted with three significant points of law. First, in reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). Second, we note this court's own acknowledgement that there is little guidance in Nebraska jurisprudence relating to alimony awards in high income cases. *Titus v. Titus*, 19 Neb. App. 751, 811 N.W.2d 318 (2012). Third, is the Nebraska Supreme Court's statement in *Kelly v. Kelly,* 246 Neb. 55, 65, 516 N.W.2d 612, 618 (1994), where the court addressed an alimony award where, similar to the instant case, there was a significant disparity between the parties' incomes. The court stated:

It is important to recognize that although the wife is fortunate enough to be able to reenter her career, her income potential is approximately a third of that of the husband. The district court's alimony award tends to even out that disparity and provides the wife with the means to partially recapture the standard of living that she and the husband jointly put together during their 19 years of marriage. Under the circumstances, the district court's award cannot be said to have constituted an abuse of discretion.

This court cited *Kelly, supra*, in *Schnackel v. Schnackel,* 27 Neb. App. 789, 815-16, 937 N.W.2d 234, 256 (2019), holding that:

Likewise, here, although [appellee/cross-appellant wife] has the potential to reenter the workforce and earn a living, her earning potential is significantly less than [that of appellant/cross-appellee husband]. In fact, according to the district court's income calculations, [appellant/cross-appellee husband] earns more per month than [appellee/cross-appellant wife] could potentially earn in 1 year. Moreover, the parties had a long-term marriage, during which they enjoyed a certain standard of living. As in *Kelly v. Kelly, supra*, the alimony awarded to [appellee/cross-appellant wife] will allow her to partially recapture that standard of living, while assisting her in maintaining marital property awarded to her such as the marital home. When considering the factors related to an alimony award, we conclude that the district court's alimony award was not an abuse of discretion.

We reach a similar conclusion here. Although the monthly alimony award provides significant time for Tracy to pursue her nursing license or other occupation and eventual employment while sustaining the standard of living Tracy and Mark established, it also provides some balance during the transitional years to allow Tracy to obtain the employment that she will need to sustain herself once the alimony award ends after six years. When considering these matters, and the factors related to an alimony award, we conclude that the district court's alimony award was not an abuse of discretion.

ATTORNEY FEES AND EXPERT FEES

Mark next argues that the district court erred in ordering Mark to pay $60,000 in attorney fees and $8,763.76 in expert fees. Mark also contends that the court erred in ordering him to pay

$15,000 in appellate attorney fees, however, the record does not include an order awarding Tracy $15,000 in appellate attorney fees.

An appellant has the duty of presenting a record on appeal which supports his or her assigned errors. See *Rodriguez v. Surgical Assocs.*, 298 Neb. 573, 905 N.W.2d 247 (2018). Since the record before this court does not include an order awarding Tracy $15,000 in appellate attorney fees, we cannot review that portion of his claim for error. Consequently, we review only Mark's claim that the district court erred in requiring Mark to pay $60,000 of Tracy's attorney fees and $8,763.76 in expert fees.

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure allows recovery of attorney fees. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019). Attorney fees shall be awarded against a party who alleged a claim or defense that the court determined was frivolous, interposed any part of the action solely for delay or harassment, or unnecessarily expanded the proceeding by other improper conduct. *Id*. See Neb. Rev. Stat. § 25-824 (Reissue 2016).

A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases, and as a matter of custom, attorney fees and costs are awarded to prevailing parties. *Moore v. Moore, supra*. In an action involving a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Id*. In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id.*

It is not strictly necessary for an applicant for attorney fees to introduce specific evidence to support an award of attorney fees, but before an award of attorney fees will be affirmed on appeal, the record must contain the information that shows that the award is within the range of the trial court's discretion. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). If the record, including the pleadings, discovery documents, attorney affidavits, or other introduced evidence, supports the award and shows that the requested fee is not unreasonable, then the reviewing court will not find that fee untenable or an abuse of discretion. *Id*.

Ordinarily, an improper calculation of attorney fees requires a remand in order to reconfigure the award. *Seldin v. Estate of Silverman*, 305 Neb. 185, 939 N.W.2d 768 (2020). However, when the record is sufficiently developed that a reviewing court can apply the law to the facts and calculate a fair and reasonable fee without resorting to remand, that route is available to the appellate court. *Id*.

Here, the district court awarded attorney fees to be paid to Tracy within 30 days stating that it was reasonable because

> This divorce and trial were overly lengthy and complicated by [Mark's] attempt to force an action for dissolution of marriage into an action to adjudicate whether [Tracy] is disabled. This increased the expert and attorneys' fees in connection herein. [Mark] shall reimburse [Tracy] for the expert fees incurred in the amount of $8,763.76 and shall pay $60,000.00 toward [Tracy's] attorney fees incurred in association with this issue.

On January 7, 2020, the court previously ordered Mark to pay Tracy's attorney fees of $7,500 and expert fees of $2,500 relating to the same issue which Mark subsequently paid.

The consideration of earning capacity has historically been of importance in dissolution cases. See, *Gleason v. Gleason*, 218 Neb. 629, 357 N.W.2d 465 (1984) (earning capacity of both parties in dissolution of marriage is proper inquiry and consideration by court); *Baird v. Baird*, 196 Neb. 124, 241 N.W.2d 543 (1976) (one of factors to be considered in determining whether award of alimony should be made is ability of supported party to engage in gainful employment); *Sowder v. Sowder*, 179 Neb. 29, 136 N.W.2d 231 (1965) (reviewing court may not disregard spouse's earning capacity).

Here, Tracy placed her earning capacity at issue when she requested alimony and claimed she was unable to work as a result of her medical conditions. Mark's evidence and arguments regarding Tracy's ability to work was not only not frivolous, but was directly relevant to the considerations of the court placed at issue by Tracy. We also note that the court ordered Mark to pay the Citibank credit card debt. In February 2020, Tracy used the Citibank credit card in the amount of $9,500 to pay what appears to be attorney fees as evidenced by a corresponding payment to her attorney in the amount of $9,500 according to the attorney billing records.

When combined with the court's prior order requiring Mark to pay $7,500 in attorney fees and $2,500 in expert fees, the court's order effectively required Mark to pay $77,000 of Tracy's attorney fees and $11,263.26 in expert witness fees related to the proceeding and trial. Because we find that Mark's defense to Tracy's claim of disability was reasonable, we find that the court abused its discretion in requiring Mark to pay $60,000 in attorney fees and $8,763.76 in expert witness fees on that basis. Therefore, we reverse and vacate that award. And because Mark has already paid $10,000 in fees from the January 7, 2020 order, and will extinguish what appears to be $9,500 in Tracy's attorney fees through his court ordered obligation to pay off the CitiBank credit card, when combined with this court's decision to affirm the alimony award based upon Tracy's proposed monthly expenses in which Tracy claimed a monthly obligation related to paying her attorney fees, we find that no further attorney fee award relating to activity occurring in the district court is justified on this record.

EXPERT TESTIMONY

Mark alleges that the district court erred in permitting Dr. Pierce to testify as an expert witness regarding Tracy's functional capacity and vocational abilities because he had been disclosed as a fact witness, not an expert witness. Mark argues that because Tracy failed to properly respond to an interrogatory he proffered, which required Tracy to disclose Dr. Pierce as an expert witness and the opinions he would offer, the district court should have precluded Dr. Pierce's testimony.

The basis for preclusion of improperly disclosed expert testimony was outlined by the Nebraska Supreme Court in *Norquay v. Union Pacific Railroad*, 225 Neb. 527, 407 N.W.2d 146 (1987). Therein, the court held:

> As a sanction for noncompliance with Rule 26(b)(4)(A)(i) [interrogatories] and the duty to supplement required by Rule 26(e)(1)(B), preclusion of an expert witness'

testimony, insofar as such testimony concerns an opinion or facts known in the witness' capacity as an expert, may be an appropriate sanction under Rule 37(d). See, *Easley v. Anheuser-Busch*, *Inc., supra*; *Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232 (5th Cir. 1981); *E.E.O.C. v. Kenosha Unified Sch. Dist. No. 1,* 620 F.2d 1220 (7th Cir. 1980). In a hierarchy of harshness in permissible sanctions under Rule 37, ranging from the least to the most harsh, preclusion of evidence lies somewhere between the reimbursement to an opposing party for expenses incurred as the result of noncompliance for discovery and dismissal or default judgment. See *Cine Forty-Second St. Theatre v. Allied Artists*, 602 F.2d 1062 (2d Cir. 1979). In determining whether to exclude testimony of an expert witness called by a party who has failed to comply with a request for discovery, the trial court should consider the explanation, if any, for the party's failure to respond, or respond properly, to a request for discovery concerning an expert witness; importance of the expert witness' testimony; surprise to the party seeking preclusion of the expert's testimony; needed time to prepare to meet the testimony from the expert; and the possibility of a continuance. See *Murphy v. Magnolia Elec. Power Ass'n*, *supra*. . . .

*Norquay v. Union Pacific Railroad*, 225 Neb. at 540, 407 N.W.2d at 155. The court further held:

An appropriate sanction under Rule 37 is determined in the factual context of a particular case and is initially left to the sound discretion of the trial court, whose ruling on a request for sanction or a sanction imposed will be upheld in the absence of an abuse of discretion. See, *Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251 (8th Cir. 1985); *Guidry v. Continental Oil Co.*, 640 F.2d 523 (5th Cir. 1981); *Fox v. Studebaker-Worthington, Inc.*, 516 F.2d 989 (8th Cir. 1975).

*Norquay v. Union Pacific Railroad*, 225 Neb. at 539, 407 N.W.2d at 155.

Here, after learning that Dr. Pierce's report had been circulated in connection with other discovery responses, the court ruled that preclusion was not warranted under the circumstances. We further note that Greene, Mark's vocational rehabilitation expert, reviewed and utilized Dr. Pierce's report when forming his opinion relating to its inaccuracies.

More importantly, as we mentioned above, the gravamen of Dr. Pierce's opinion was that Tracy could no longer work due to her medical conditions. The district court ultimately found that the opinion was inconsistent with Tracy's activity level and determined that Tracy could return to work. Moreover, following our de novo review, as we stated before, we agreed with the district court's determination that Tracy had the capacity to return to work.

In short, Dr. Pierce's testimony did not result in prejudice to Mark. See *Kvamme v. State Farm Mut. Auto. Ins. Co.,* 267 Neb. 703, 677 N.W.2d 122 (2004) (to constitute reversible error in civil case, wrongful admission of evidence must unfairly prejudice substantial right of litigant complaining about evidence admitted). This assignment of error fails.

Mark's fourth assignment of error is that the district court abused its discretion in finding that his student loan debt was nonmarital property.

Under § 42-365, the equitable division of property is a three-step process. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020). The first step in the equitable division of property is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. *Id.* The second step in the equitable division of property is to value the marital assets and marital liabilities of the parties. *Id.* The third step in the equitable division of marital property is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Id.* The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id.* Further, debts, like property, ought to also be considered in dividing marital property upon dissolution. *Ramsey v. Ramsey*, 29 Neb. App. 688, 958 N.W.2d 447 (2021).

A marital debt is one incurred during the marriage and before the date of separation by either spouse or both spouses for the joint benefit of the parties. *Vanderveer v. Vanderveer*, 310 Neb. 196, 964 N.W.2d 694 (2021); *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). In that regard, Mark argues he incurred student loans both prior to, and after, the parties' marriage. Loan documents reflect that $192,761.26 in student loans were disbursed after the marriage. Further, Mark argues that his testimony that a third of those loans was used to pay marital expenses was uncontradicted. He contends that, because Tracy benefited from his income generated through the procurement of these loans and more directly from the utilization of approximately a third of the loans to pay marital expenses, the court erred in assigning all such loans as nonmarital.

We recently addressed a similar argument in *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021), wherein the appellant husband argued that he took an additional $41,000 from his student loan during the marriage to cover marital debt, but neither party provided evidence on how that money was spent. To those facts, we held:

> Marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). As the parties discuss in their briefs on appeal, this court found in *Walker v. Walker*, 9 Neb. App. 694, 618 N.W.2d 465 (2000), that the district court did not abuse its discretion in finding student loan debt accrued during the marriage to be nonmarital where the parties disputed the extent to which the student loans were used for joint marital interests or the obligor's education. The record showed a student loan indebtedness of $63,800, which was approximately $20,000 in excess of the obligor's direct educational expenses. In that case, we noted the obligor took "with her all of the benefits of her law school education, and equity requires that she take with her those debts directly related to obtaining that degree." *Id.* at 700, 618 N.W.2d at 471. This holding demonstrates the importance of presenting a sufficient record that establishes the distribution and utilization of student loans incurred during the marriage.

> Despite [the appellant husband's] assertion on appeal that certain amounts of his loan were directly paid to the school and that the entirety of the $40,622.80 was for joint

marital benefit, we have before us neither any sort of itemization of the student loan proceeds nor records of tuition payments to the school or other educational costs that would identify whether or not the deposited amounts were in excess of such costs, thus making them available to use for joint marital expenses. The record does not contain any accounting for how the student loan proceeds deposited into the joint account were utilized during the marriage. Rather, the record before us shows only that $40,622.80 was deposited into the parties' joint account while [the appellant husband] was in school and that there remains an outstanding balance on Lucas' student loans. [The appellant husband] asserts that these facts, without further context, compel this court to attribute the $40,622.80 to the marital estate as a marital debt. In effect, [the appellant husband] asks this court to assume the $40,622.80 went to the joint benefit of the parties purely through its presence in the joint account. However, the evidence does not indicate whether the deposited proceeds went toward [the appellant husband's] education or support for the family while he was in school. In the absence of further evidence and context regarding [the appellant husband's] student loans, we cannot say the district court abused its discretion in not attributing any amount of [the appellant husband's] student loan debt to the marital estate.

*Wright v. Wright*, 29 Neb. App. 787, 806-08, 961 N.W.2d 834, 848-49 (2021).

We reach a similar conclusion here. Mark will continue to receive the benefit of his education long into the future. And having not provided evidence other than a general estimate of the current loan proceeds spent on marital expenses, applying the rationale set forth in *Wright, supra*, we cannot say the court's determination here was inequitable or an abuse of discretion. This assignment of error fails.

ALLOCATION OF RETIREMENT ACCOUNTS

In assessing the three-step formula for the division of assets articulated above, Mark's final argument is that the court erred in dividing the parties' marital property by awarding Mark all the retirement accounts, allocating most of the debts to him, and awarding Tracy nearly all the cash assets.

The basis of Mark's argument is that the combination of the alimony award, the attorney fee award, the allocation of all the unsecured debt to Mark, and the provision of the retirement accounts to him, inequitably left him in a position where he had insufficient cash assets to meet his own obligations. On the basis of our findings as more fully set forth herein, we disagree with Mark's assertion that, pursuant to the final division of property and alimony award, Mark is unable to adequately meet his obligations. More specifically, having reversed and vacated the portion of the district court's order requiring Mark to pay Tracy additional attorney fees and expert witness fees; having determined that Mark does generate sufficient income to pay his alimony and personal obligations; and having affirmed all other portions of the decree including the award of $91,033.92 in proceeds to Mark from the sale of his Lincoln home, we find Mark's argument that he has insufficient cash to meet his obligations following the court's division of assets fails.

- 15 -

## CONCLUSION

For the reasons stated above, we affirm the district court's determination of the marital estate and its division and the temporary and permanent alimony awards. However, we reverse and vacate the court's orders requiring Mark to pay $60,000 in attorney fees and $8,763.76 in expert witness fees.

AFFIRMED IN PART, AND IN PART REVERSED AND VACATED.